IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 28, 2022

**SHAWN L. PAYNE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Knox County**
**No. 100235   Steven Wayne Sword, Judge**

_____

**No. E2021-01017-CCA-R3-PC**

_____

Pursuant to a plea agreement, the Petitioner, Shawn L. Payne, pled guilty to second degree murder, and the trial court sentenced him to 25 years' incarceration. See Tenn. Code Ann. § 39-13-210(a)(1). The Petitioner subsequently filed a petition for post-conviction relief, alleging ineffective assistance of counsel. After a hearing, the post-conviction court denied the petition. On appeal, the Petitioner argues that he received ineffective assistance of counsel, rendering him unable to make a "knowing and informed" guilty plea. Specifically, he asserts that trial counsel was ineffective in failing to investigate the case adequately, failing to provide discovery to the Petitioner, and failing to apprise the Petitioner of all the consequences of his guilty plea. After careful review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JILL BARTEE AYERS and JOHN W. CAMPBELL, SR., JJ., joined.

Gerald L. Gulley, Jr., Knoxville, Tennessee, for the Appellant, Shawn L. Payne.

Herbert H. Slatery III, Attorney General and Reporter; Kayleigh Butterfield, Assistant Attorney General; Charme P. Allen, District Attorney General; and Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The Knox County Grand Jury returned a two-count indictment against the Petitioner, charging him with one count of first-degree murder and one count of attempted first degree murder. On October 12, 2011, the Petitioner pled guilty to the lesser-included offense of second degree murder, and the State dismissed the attempted murder charge.

At the guilty plea hearing, the State explained that the Petitioner did not agree to testify against his co-defendants and provided the following summary of the facts underlying the Petitioner's charges:

Patricia Tipton, of the Knoxville Police Department, would testify that she responded to a shooting call that occurred in Western Heights, at 1248 Better Tomorrow Drive, on September the 15th, 2009.

She would testify that she interviewed a number of witnesses. Three people, Tawaun Mattress, Richard Westfield and Brandon Williams, advised her that they, along with the victim, Christopher McBath, were on the front porch of a residence in the neighborhood just talking and chatting. This is about 10:30 p.m. They were approached by three figures dressed in black; that gunfire erupted. Christopher McBath turned to run and was shot. Richard Westfield would testify that he was also injured as he tried to flee the scene.

Further proof would be that Tawaun Mattress . . . a later time, once Investigator Tipton was able to receive information from anonymous tips that [the Petitioner] was involved, she was able to develop a line-up. And Tawaun Mattress identified [the Petitioner] as being one of the shooters present.

Further proof would be that Trent Barton and Monica Wright were also identified as two of the shooters.

Further, please, Ms. -- Investigator Tipton would testify that as she pursued this investigation, but before she was able to apprehend [the Petitioner], it came to her attention that he was making efforts to leave the area. She feared that he was going to Indiana to escape apprehension. Proof would be that he was taken into custody, however, in Knoxville, and, I believe, has been in custody since October the 2nd, 2009.

Your Honor please, Darinka Mileusnic would testify that Mr. McBath died of multiple gunshot wounds. He was shot three times, twice in the back. This is consistent with the ballistics evidence that was recovered at the scene. Crime Scene Technician Beth Goodman worked this scene and found evidence that corroborates the witness's testimony that there were three shooters. Crime Scene Technician Goodman would testify that she found

two .45-caliber casings at the scene, three .40-caliber casings, one 9-millimeter casing and a couple of bullet fragments.

The State would further prove that with respect to -- with respect to motive in this case, about a month prior to the shooting, Monica Wright was in the car with a woman named Antanica Wade; that she was stopped and was talking to Christopher McBath at a location in Knoxville; that shortly after their conversation, Ms. Wright and Ms. Wade were arrested by officers of the Knoxville Police Department because of a drug transaction that they saw.

And our proof would be, from Investigator Phil Muhlfeld, that while Ms. Wright and Ms. Wade were in his cruiser, that they were videotaped. And the State would provide evidence that - of this tape-recording that shows Ms. Wright accusing Mr. McBath of being a snitch and her verbal threats to get back at him. And the State would present proof -- testimony proof, through Officer Muhlfeld and through Antanica Wade, that this was the motive behind Mr. McBath's shooting.

Following the recitation of facts, the Petitioner stipulated that "that's what the State's proof would be." The trial court also questioned the Petitioner regarding his understanding of the rights he waived by pleading guilty, to which he affirmed his understanding. The Petitioner further affirmed that he had gone over the plea agreement with trial counsel and understood the agreement. Before accepting the Petitioner's guilty plea, the following exchange occurred:

THE COURT: Are you entering into this agreement freely and knowingly and voluntarily?
[THE PETITIONER]: Yes, sir.
THE COURT: Has anyone threatened you in any way or promised you anything to get you to plead guilty today?
[THE PETITIONER]: No, sir.
THE COURT: Are you pleading guilty because you are, in fact, guilty?
[THE PETITIONER]: Yes, sir.
THE COURT: Are you satisfied with the services of your attorney?
[THE PETITIONER]: Yes, sir.
THE COURT: Is there any question about anything at all that you want to ask the Court before we go through with this?
[THE PETITIONER]: No, sir.

The trial court subsequently accepted the Petitioner's guilty plea and sentenced him as a Range I, standard offender to 25 years' imprisonment. The Petitioner filed a pro se petition for post-conviction relief on September 10, 2012, alleging, among other things, ineffective assistance of counsel and that his guilty plea was involuntary. The Petitioner filed an amended pro se petition for post-conviction relief the same day, again asserting that he received ineffective assistance of counsel, specifying that trial counsel failed to investigate his case. The post-conviction court appointed counsel on September 20, 2012, and on September 9, 2013, the Petitioner filed a "motion to relieve counsel of record and appoint new counsel." In the motion, the Petitioner asserted that his appointed counsel had not made contact with him or helped amend his petition, and the post-conviction court appointed new counsel on December 10, 2013. On February 27, 2014, the Petitioner filed a "motion for substitution of counsel," seeking to replace the counsel that was appointed on December 10, 2013, again asserting that he could not contact appointed counsel. Although not included in the record, that motion was apparently denied, as the second appointed counsel represented the Petitioner at the post-conviction hearing and represents him again on appeal. The Petitioner filed another amended pro se petition for post-conviction relief on February 27, 2014, again alleging, among other things, that he received ineffective assistance of counsel, such that his guilty plea was not knowing and voluntary. On December 10, 2019, the State filed an "answer to original pro se petition and amended petition," and the case was transferred to a different division of the Knox County Criminal Court on December 11, 2019. The hearing on the petition for post-conviction relief was not held until August 5, 2021. The record contains no explanation for the lengthy delay between the Petitioner's filing of his petition for post-conviction relief and its amendments and the hearing. At the August 5, 2021 hearing, post-conviction counsel explicitly stated that he would be "traveling under the original" petition.

At the August 5, 2021 hearing, the Petitioner testified that his plea was coerced because trial counsel informed him he could potentially "go to trial and lose and get 60 years[.]" The Petitioner was "18, 19 years old" at that time and "didn't know what coercion meant." He agreed that trial counsel met with him "[l]ess than five" times while in "Sessions Court[.]" During his preliminary hearing, trial counsel did not object to "two inconsistent statements" where "[o]ne person was saying one thing, the other person was saying another." The Petitioner explained that during his preliminary hearing, the court stopped the hearing to tell Tawaun Mattress' mother to stop "gesturing towards" Mr. Mattress during his testimony. After the case was bound over to the grand jury and an indictment was returned, trial counsel "came to the penal farm a couple of times" and "wrote a couple of letters" to the Petitioner. Trial counsel brought the "motion of discovery" to the penal farm for the Petitioner to view but did not bring "some CDs and DVDs[,]" which the Petitioner did not know existed until he filed his post-conviction petition. The Petitioner testified that trial counsel hired Michael Cohan, an investigator, to assist in the case, and Cohan came to the penal farm with trial counsel "a few times[.]"

- 4 -

Trial counsel provided to the Petitioner "paperwork of the motion of discovery . . . [and] exculpatory Brady materials" but did not discuss "witness statements or anything like that" with the Petitioner.

The Petitioner stated that trial counsel did not inform him of the plea agreement offer from the State until the "day [he] was supposed to go to trial[.]" He clarified that he also received an oral plea agreement offer at his preliminary hearing, which he did not accept because he did not know, and trial counsel did not explain, the "potential advantages" of a plea offer. He reiterated that trial counsel did not inform him of the instant plea agreement offer until the morning of trial while he was in the "holding cell in the back[.]" Trial counsel read and explained the written plea agreement to the Petitioner for "about ten minutes" before giving it to him. The Petitioner denied that trial counsel ever prepared him for trial, discussed the defense theory, discussed whether he should testify, or provided him with any documents that the State was going to introduce at trial. The Petitioner did not feel "prepared" to go to trial. Although the Petitioner understood that he would "be pleading to 25 years," he did not understand "the percentage of it or how long [he] would be incarcerated." The Petitioner felt like he "had no other choice" but to accept the plea offer because he knew he would receive a higher sentence if he lost at trial. He agreed that his failure to receive all of the State's discovery affected his decision to accept the plea offer. The Petitioner elaborated that he did not know about "the video footage or phone calls" that the State possessed until post-conviction counsel sent them to him. He did not know what the video footage contained but learned about it after reading the motion for discovery. The Petitioner testified that he reported trial counsel to the Board of Professional Responsibility "at the beginning of [his] case" for failing to represent the Petitioner to the best of his ability. He elaborated that he felt like trial counsel was "working for the State or with the State." The Petitioner agreed that his reporting trial counsel had "an effect upon [his] representation[.]" He "lost confidence" in trial counsel but felt that he "was forced to keep him as [his] attorney."

On cross-examination, the Petitioner agreed that he had "at least three trial dates[.]"[1] He further agreed that the State's proof at trial was "going to be that there were three people who participated in . . . the victim's murder" and that the Petitioner was identified in a photographic lineup as one of the shooters by Tawaun Mattress. He affirmed that another witness, Richard Westfield, identified two of the three shooters but was unable to identify the Petitioner as the third. The Petitioner agreed that "two years went by" before he pled guilty. He was "unaware" that Christopher Smalley, an inmate at the Knox County penal

---

[1] Prior to the Petitioner's cross-examination, the post-conviction court and the State clarified that the Petitioner's trial was originally set for September 1, 2010, but was continued to October 4, 2011. [II, 20]. On July 15, 2011, the October 4 trial date was rescheduled to December 12, 2011. [Id.]. The Petitioner entered his guilty plea on October 12, 2011. [II, 21].

farm, stated that the Petitioner admitted to him that he was one of the shooters or that Monica Jones,[2] one of the Petitioner's co-defendants, told the State that the Petitioner was one of the shooters. The Petitioner did not recall a letter sent to him from Trent Barton, his other co-defendant, stating that they "would get away with it" if "everyone kept quiet[.]" He agreed that the State's theory was that co-defendant Jones was angry with the victim because she believed he was responsible for her "getting busted for a drug offense." The Petitioner further agreed that the State's theory was that he and co-defendant Barton acted as "muscle" for co-defendant Jones and her husband, Donnie Jones, who allegedly sold drugs in Knoxville. He agreed that the preliminary hearing was held a little over a month after the victim's murder, and he "had early knowledge of the facts around [his] case" at the time of the hearing.

Although the Petitioner conceded that trial counsel filed various motions on his behalf, he disputed that trial counsel collected discovery information on his behalf. The Petitioner explained that although he answered negatively when the trial court asked if he had any questions when he entered his guilty plea, he did not know at that time that he "didn't receive all [his] motion of discovery." He asserted that there were phone calls and "video footage" that he never saw, although he did not know their contents. The Petitioner did not "understand all that" when he declined to object to the State's offer of proof at the plea hearing but agreed he had been to court "a few times" previously. The Petitioner reiterated that he "would have rather [gone] to trial" than accept the guilty plea agreement, though he was aware that he was "facing a life sentence" if convicted at trial.

The post-conviction court also questioned the Petitioner to ensure it understood the Petitioner's grievances with trial counsel. The Petitioner clarified that his primary complaint against trial counsel was that he did not show the Petitioner all of the discovery provided by the State prior to the Petitioner pleading guilty. When asked what information he gained since pleading guilty, the Petitioner responded that he did not know his "whole case was circumstantial" or know about "the audio and the video[.]" He conceded that he did not know what was on the video and therefore was unsure if it could have helped him. The Petitioner explained that he knew a video existed because "in [his] motion for discovery it says … [there are] some DVDs and . . . some audio and video." He reiterated that he did not know about the video until post-conviction counsel took over his case, and he still did not know what the DVD contained. When asked by the post-conviction court how he knew he would have gone to trial if he were shown the DVD if he did not know its contents, the Petitioner responded, "I mean, I don't . . . . [W]hen I was going through my motion of discovery and reading the whole motion and going through all my paperwork, I just felt like I would have [gone] to trial and had a better chance of going to trial than taking

---

[2] We note that the State referred to the Petitioner's female co-defendant as both Monica Wright and Monica Jones at the post-conviction hearing. For clarity, we refer to her as Monica Jones.

this plea bargain." The post-conviction court asked what "specific facts or legal theory" he based such an assertion on, and the Petitioner responded, "The evidence . . . . It was circumstantial, everything, the whole case." The post-conviction court noted that Mattress testified at the preliminary hearing that the Petitioner was one of the shooters, which was not circumstantial. The Petitioner clarified that although Mattress testified he saw the Petitioner "shoot somebody," Westfield, the person who "he was charged with attempted murder on[,]" said he didn't know" the Petitioner and had never seen him before. Further, Westfield told Cohan that he had known the Petitioner a long time and had "seen [the Petitioner] there, but [he] didn't have a gun." The Petitioner affirmed that if he had known that information before pleading guilty, he would have gone to trial. The Petitioner further affirmed that neither trial counsel nor Cohan talked to him about what Westfield's trial testimony would be, and he did not know about Westfield's differing statements until after he pled guilty. He clarified that at the preliminary hearing, Westfield testified that he did not know the Petitioner and had never see him before but later told Cohan that he had known the Petitioner a long time and saw him at the shooting, but he did not have a gun.

Trial counsel testified that he had been practicing law for nine years, primarily in criminal defense, when he was appointed to represent the Petitioner in 2009. At that time, he had tried several first-degree murder cases and "at least one" life without the possibility of parole case. Upon being appointed, trial counsel obtained the affidavit of complaint, identified potential witnesses, and attempted to develop an alibi for the Petitioner through "Ms. Dale," his significant other. He received discovery from the State, including an interview of the Petitioner by Investigator Tipton, during which the Petitioner asserted that he "had no awareness of what happened." Trial counsel also sent a letter to the Petitioner asking for any witnesses that he wanted trial counsel to interview, but trial counsel did not "recall getting a name or a phone number or an address of . . . any witnesses" from the Petitioner. He testified that his file for the Petitioner consisted of "over 2,000 pages" and contained "quite a few memoranda . . . that [he] had prepared internally."

Trial counsel testified that Mattress' identification of the Petitioner as one of the shooters at the preliminary hearing concerned him because he knew the Petitioner was facing a life sentence, which the Petitioner was aware of "early on." Trial counsel did not recall the Petitioner sending a letter to the Board of Professional Responsibility but did recall the Petitioner filing a motion to disqualify trial counsel as his attorney. After trial counsel filed a motion for discovery and received discovery from the State, he turned "all that" over to the Petitioner. He believed that he "sent a letter to [the Petitioner] with the DVD and/or CDs[,]" though he was unsure what the "Knox County Sheriff's Department did with that when it got sent[.]" Trial counsel gave Cohan a copy of the discovery, and Cohan prepared a "discovery summary." Trial counsel noted in one of his "internal memoranda" that the Petitioner reviewed the discovery summary. Trial counsel recalled the State providing another round of discovery, which he also provided to the Petitioner.

He explained that he "always" turned all discovery over to his clients because he thought doing so was "very important." Trial counsel recalled that the State was "stuck" on offering a plea deal of 25 years at 100% for second degree murder. The Petitioner was "willing" to do "15 years on a second[]degree," which was the lowest end of the sentencing range. [II, 50]. The State "eventually came back" and offered 20 years if the Petitioner was willing to testify against his co-defendants, which he did not want to do. Trial counsel believed that the Petitioner did not want to testify against his co-defendants because he "knew a lot more than what he wanted to talk about." Trial counsel "did everything that [he] could" to educate the Petitioner on the facts and law relevant to his case.

At some point, the Petitioner alluded to a fourth person being involved in the shooting, but trial counsel did not "know who that was." The Petitioner also mentioned to trial counsel that there was another person named "Pain" that people confused him with, and it was "almost his position" that "Pain" was the actual shooter. The Petitioner ultimately "did not want to go down that road as that being a defense[,]" which trial counsel respected. With respect to the DVD that the Petitioner alleged he did not know about until after pleading guilty, trial counsel explained that the video was of co-defendant Jones and another woman in the back of a police car following a traffic stop "fussing about getting pinched" for drugs that did not belong to Jones. He recalled describing the video to the Petitioner and discussing with him why such a video was included in discovery. Trial counsel asked the State about the video and learned that the State's theory was that the victim set up co-defendant Jones to be arrested, and "then this hit was ordered to go take care of" the victim. Essentially, the video corroborated the State's theory of retaliation. Trial counsel believed that co-defendant Jones was the Petitioner's cousin. He did not recall talking to the State about a proffer that co-defendant Jones made. Trial counsel did not recall entering the guilty plea on the day of trial in the Petitioner's case or any other case. He agreed that the Petitioner would have received a significantly harsher sentence if he had gone to trial and been convicted of first-degree murder. He further agreed that he was satisfied as the Petitioner's counsel that he entered his guilty plea knowingly, voluntarily, and intelligently.

On cross-examination, trial counsel agreed that he attended a hearing in front of the trial court to "flesh[] out" the Petitioner's complaints against him. At the hearing, the trial court told the Petitioner that trial counsel was "a good attorney" and "would be there to see him when [he] had something of significance to talk to him about." He recalled that the Petitioner was "very upset about, maybe, [they] had not received the discovery at that point or something." Trial counsel explained that he had "at least two memoranda" in his internal file showing that he and Cohan discussed the terms of the plea agreement with the Petitioner prior to the day he entered his guilty plea, both "in general" and "what 15 looked like at 100 percent, what 25 looked like at 100 percent, what 60 [] looked [like] at 100 percent[,]" though the Petitioner did not see the physical document until October 12. Trial

counsel did not recall whether he read the document to the Petitioner or whether the Petitioner had any difficulty reading. He met with the Petitioner "[l]ong enough to make sure he understood what he was doing and that he was doing it voluntarily." Trial counsel did not recall whether he discussed with the Petitioner what the specific procedures for the plea hearing would be but agreed that he had attended multiple plea hearings at that point in his career.

The post-conviction court entered a "Findings of Fact and Conclusions of Law" on August 10, 2021, denying the Petitioner's post-conviction petition. In denying the petition, the post-conviction court specifically accredited trial counsel's testimony over that of the Petitioner. With respect to whether the guilty plea was knowingly and voluntarily entered, the post-conviction court found that "due process was satisfied[,]" noting that the Petitioner's refusal to testify against his co-defendants indicated "that there were detailed discussions about the nature and reasons for the Petitioner's guilty plea." The post-conviction court also noted that the Petitioner affirmed to the trial court that he understood his rights and pled guilty because he was guilty. With respect to the Petitioner's ineffective assistance of counsel claims, the post-conviction court found that trial counsel "conducted a thorough investigation of the case, had many discussions with the Petitioner about the evidence, discussed potential trial strategies, and obtained more than one plea offer from the State." The post-conviction court concluded that there "was no evidence presented" that trial counsel was deficient or that the Petitioner was prejudiced by the alleged deficiencies. The Petitioner filed a timely notice of appeal on September 2, 2021, and this case is now properly before this court for review.

## ANALYSIS

The Petitioner asserts on appeal that the post-conviction court erred in denying him relief because "trial counsel failed to investigate the case adequately, failed to provide relevant information [to] the Petitioner and discuss it with him, and failed to apprise the Petitioner of all the consequences of his plea agreement[,]" such that the Petitioner was "prevented from making a knowing and informed guilty plea[.]" The State responds that trial "counsel was not ineffective, and the [P]etitioner's plea was voluntary and intelligent." We agree with the State.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover,

- 9 -

factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases. Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted). In order to prevail on an ineffective assistance of counsel claim, a petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694). In order to satisfy the "prejudice" requirement in the context of a guilty plea, the petitioner must show that, but for counsel's errors, he would

not have entered his guilty plea and would have proceeded to trial. Serrano v. State, 133 S.W.3d 599, 605 (Tenn. 2004) (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

The validity of a guilty plea is a mixed question of law and fact that is reviewed de novo. Lane, 316 S.W at 562. To be valid, a guilty plea must be entered knowingly, voluntarily, and intelligently. Id. (citing State v. Mackey, 553 S.W.2d 337, 340 (Tenn. 1977) superseded on other grounds by rules as stated in State v. Wilson, 31 S.W.3d 189, 193 (Tenn. 2000); North Carolina v. Alford, 400 U.S. 25, 31 (1970); Brady v. United States, 397 U.S. 742, 747 (1970); Boykin v. Alabama, 395 U.S. 238, 242-44 (1969)). "[T]he record of acceptance of a defendant's plea of guilty must affirmatively demonstrate that his decision was both voluntary and knowledgeable, i.e., that he has been made aware of the significant consequences of such a plea[.]" Mackey, 553 S.W.2d at 340; see Tenn. R. Crim. P. 11(b)(1). When determining whether a guilty plea was knowingly, voluntarily, and intelligently entered, the court must consider "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" Lane, 316 S.W.3d at 562 (quoting Grindstaff, 297 S.W.3d at 218). If a guilty plea is not knowingly, voluntarily, and intelligently entered, then the defendant has been denied due process, and the guilty plea is void. Id. (citations omitted). In ascertaining whether a petitioner's guilty pleas were knowing and voluntary, this court looks to the following factors:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

Blankenship v. State, 858 S.W.2d 897, 904 (Tenn. 1993). Further, we note that "[a] petitioner's solemn declaration in open court that his plea is knowing and voluntary creates a formidable barrier in any subsequent collateral proceeding because these declarations 'carry a strong presumption of verity.'" Dale Wayne Wilbanks v. State, No. E2014-00229-CCA-R3-PC, 2015 WL 354773, at *10 (Tenn. Crim. App. Jan. 28, 2015) (quoting Blackledge v. Allison, 431 U.S. 63, 74 (1977)). In the context of a guilty plea, trial counsel's effectiveness is only relevant to the extent that it affects the voluntariness of the plea. Ford v. State, No. E2018-00702-CCA-R3-PC, 2019 WL 1220790, at *3 (Tenn. Crim. App. Mar. 14, 2019).

Applying the above law to the instant case, we conclude that the Petitioner is not entitled to relief. The Petitioner asserts that trial counsel's alleged deficiencies in failing to provide him with certain discovery, namely "CDs and DVDs from the State[,]" failing

to investigate his case adequately, and failing to "apprise the Petitioner of all of the consequences of his plea agreement" rendered his guilty plea unknowing and involuntary.

The Petitioner has failed to establish that trial counsel was deficient because he did not show that trial counsel's representation fell below the range of competence demanded of attorneys in criminal cases. The post-conviction court found that trial counsel "conducted a thorough investigation of the case, had many discussions with the Petitioner about the evidence, discussed potential trial strategies, and obtained more than one plea offer from the State." We reiterate that the post-conviction court specifically accredited trial counsel's testimony over that of the Petitioner. Trial counsel testified that upon being appointed as the Petitioner's trial counsel, he began investigating the case, including attempting to establish an alibi defense through "Ms. Dale," asking the Petitioner for a list of witnesses, and hiring an investigator. The Petitioner also apparently discussed with trial counsel a possible fourth shooter and his being confused with another person named "Pain" as a potential defense. Trial counsel testified that he turned all discovery over to the Petitioner and gave a copy of the discovery to Cohan, who prepared a summary of the discovery. Internal memoranda indicated that the Petitioner reviewed the discovery summary. Trial counsel recalled sending the DVD in question to the Petitioner, though he was unsure if the Petitioner received it. Regardless, trial counsel recalled discussing the contents of the DVD with the Petitioner, namely co-defendant Jones in the back of a police car talking about being "set up" by the shooting victim. The DVD substantiated the State's theory of retaliation. We note that the State also referenced such a recording in its recitation of facts at the plea hearing, which the Petitioner stipulated would be the State's proof at trial. Still, the Petitioner testified at the post-conviction hearing that he was unsure of what the DVD contained, and neither the DVD nor Westfield's allegedly conflicting statements were introduced at the post-conviction hearing, nor did the Petitioner call Westfield as a witness at the hearing.

The Petitioner also did not introduce the motion for discovery at the post-conviction hearing. We note that initially the Petitioner responded, "I mean, I don't," when asked how he knew he would have gone to trial if he possessed all of the discovery materials. Trial counsel explained that the State offered the Petitioner a 20-year sentence if he was willing to testify against his co-defendants, which he declined. His choice not to testify against his co-defendants was reiterated by the State at the plea hearing. Trial counsel denied that the Petitioner was scheduled for trial on the day of the guilty plea submission, which was supported by the State's clarification of dates at the post-conviction hearing; at the time of his guilty plea submission on October 12, 2011, the Petitioner's trial was set for December 12, 2011. Trial counsel testified that he and Cohan discussed the terms of the plea agreement with the Petitioner prior to October 12, and he met with the Petitioner long enough to ensure he was entering his plea voluntarily. Nothing in the record preponderates against the post-conviction court's conclusion that trial counsel was credible "in his

- 12 -

testimony throughout the hearing" and that the Petitioner was not credible. Because the Petitioner has failed to demonstrate trial counsel's deficiencies or that such deficiencies prejudiced him, he is not entitled to relief.

Having concluded that the Petitioner's trial counsel was not ineffective, we further conclude that the Petitioner's claims that such ineffective assistance rendered his guilty plea unknowing and involuntary are unpersuasive. With respect to the voluntariness of the Petitioner's plea, the post-conviction court found that the Petitioner's due process rights were satisfied. The post-conviction court concluded that

> [T]he Petitioner was only 19 years old when he entered his guilty plea. There is no evidence before the court concerning his intelligence. However, he was represented by a very skilled attorney who consulted with the Petitioner throughout the case from the very beginning. The Petitioner was adamant that he would not testify against a co-defendant: [t]he plea colloquy specifically spells this out. The court finds this fact to support the proposition that there were detailed discussions about the nature and reasons for the Petitioner's guilty plea. Primarily, the Petitioner pled guilty to avoid a life-sentence. The Petitioner informed the trial court that he understood each of his rights and was pleading guilty because he was guilty. Thus, the court finds that due process was satisfied.

The record reflects that trial counsel engaged in negotiations with the State regarding sentence length, and the Petitioner rejected an offer of 20 years because he did not want to testify against his co-defendants. Trial counsel testified that the State was "stuck" on the Petitioner serving 25 years at 100% for second degree murder, to which the Petitioner ultimately agreed. Such a sentence was significantly less than the life sentence the Petitioner would have received if he were convicted of first degree murder at trial, which trial counsel testified he was "worried about" due to Mattress' identification of the Petitioner as one of the shooters. Trial counsel also testified that he and Cohan went over the terms of the agreement with the Petitioner and what different sentence lengths would look like at 100% service prior to the plea hearing, and the Petitioner was not scheduled for trial until two months after the plea submission, despite his claims to the contrary. At the plea hearing, the Petitioner heard the State tell the trial court that his plea agreement consisted of him pleading guilty to second degree murder with a sentence of 25 years to be served at 100% minus any "good time credit that he could receive, up to 15 percent." He affirmed to the trial court that that was also his understanding of the agreement. We likewise note that the "Waiver of Trial by Jury and Request for Acceptance of Plea of Guilty" contained in the record on appeal and bearing the Petitioner's signature states that the plea agreement consisted of "25 years as a Range I standard offender . . . with a release eligibility after service of 100% but may receive reduction to not less than 85%[.]" The

Petitioner further affirmed to the trial court that he had gone over the agreement with trial counsel and understood its terms. The Petitioner agreed that he understood the rights he gave up by pleading guilty, that his plea was entered knowingly and voluntarily, that he had not been threatened or otherwise coerced into pleading guilty, and that he was satisfied with trial counsel's services. He further denied that he had any questions for the trial court. "[R]epresentations of the defendant, his lawyer, and the prosecutor at such a hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity." Blackledge, 431 U.S. at 73-74. Moreover, as noted above and as noted by the State, the discovery that would have allegedly caused the Petitioner to go to trial instead of pleading guilty was not introduced at the post-conviction hearing, and the Petitioner's testimony differed on whether he would have gone to trial if presented with all the discovery. The post-conviction court accredited trial counsel's testimony that the Petitioner was provided with all discovery and reviewed a discovery summary prepared by Cohan. Ultimately, the record reflects that trial counsel provided competent advice regarding the guilty plea, and the Petitioner made a voluntary and informed decision to plead guilty in order to avoid receiving a life sentence if convicted at trial. Because the Petitioner has failed to establish that his plea was unknowing, involuntary, or unintelligent, he is not entitled to relief.

## CONCLUSION

Based on the above reasoning and authority, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE

- 14 -